UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PATRICK BASS and JOCELYN BASS, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 1:20-cv-7-TFM-M |
| | ) | |
| M/V STAR ISFJORD, GRIEG STAR | ) | |
| SHIPPING II AS and G2 OCEAN AS, | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Now pending before the Court is the *Motion for Summary Judgment or, in the alternative, for Partial Summary Judgment (with Incorporated Brief)* (Doc. 61, filed 10/05/21) filed by Defendants Grieg Star Shipping and G2 Ocean.  Having considered the motion, response, reply, the evidentiary submissions in support of the motions, and the relevant law, the Court finds Defendants' motion for summary judgment (Doc. 61) is **GRANTED in part** and **DENIED in part** as discussed below.

## I.   PARTIES AND JURISDICTION

Plaintiffs Patrick Bass ("Mr. Bass") and Jocelyn Bass ("Mrs. Bass") (collectively, "Plaintiffs"), assert claims of negligence, gross negligence, wanton conduct, punitive damages, and damages for loss of consortium against Defendants M/V STAR ISFJORD, Grieg Star Shipping II AS, and G2 Ocean AS.  M/V STAR ISFJORD is a Norwegian Flagged cargo vessel owned and/or operated by Defendant Grieg Shipping II, AS (a Norwegian company).  G2 Ocean AS is a company based in Norway that is a joint venture between Defendant Grieg Shipping II AS and Gearbulk (another open hatch ship owning company).  The instant motion for summary judgment is brought by Defendant Grieg Shipping II, AS and G2 Ocean AS (collectively referred to as

"Defendants" in this opinion).

This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1333 (admiralty, maritime, and prize cases). The parties do not contest personal jurisdiction or venue, and the Court finds that sufficient support exists for both.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Background

On December 14, 2018, the M/V STAR ISFJORD, an ocean-going cargo vessel designed with numerous cargo holds, arrived in Houston, Texas from Germany. *See* Doc. 69-1, Emergency Action Notification from the U.S. Department of Agriculture ("USDA"); Doc. 69-10, M/V STAR ISFJORD diagram. On December 17, 2018, the USDA issued an Emergency Action Notification to the vessel, notifying it that the wood packaging material with the shipment was noncompliant because, "[l]ive insects of the family Cerambycidae were extracted from the wood packaging material in this entry." Doc. 69-1. The USDA ordered, "[t]he shipment must be loaded in a sealed hold and cannot be opened while in US waters/ports." *Id*.

On December 19, 2018, Don Walden, an Operator with Defendant G2 Ocean AS, sent an email, to Captain Jose Montalban, the Captain of the M/V STAR ISFJORD, to comply with the Emergency Action Notification. *Id*. The email requested that the crew of the vessel tape and seal the tween deck covering the contaminated cargo stowed on the tank top of Hold No. 4 and to send him pictures upon completion. Doc. 69-2. Accordingly, on December 20, 2018, Captain Montalban and Chief Mate Joel Abrantes sent a photograph to Mr. Walden that shows the stairwell to the tank top of Hold No. 4 was covered with cardboard and taped. Doc. 69-3. In response, Mr. Walden expressed gratitude to the men and crew for doing a job well done. *Id*.

The M/V STAR ISFJORD left Houston, Texas, traveled to Mexico, and returned to Mobile,

Alabama on January 7, 2019.  When the vessel arrived in Mobile, there was a pre-work ("turnover") meeting between the crewmembers of the M/V STAR ISFJORD.  Specifically, this meeting included Chief Mate Abrantes -- the individual who placed the cardboard over the open manhole in the stairwell landing -- and Malachi Ojeda -- the head superintendent of CSA Equipment Company, LLC ("CSA").  Doc. 61 at 2, Doc. 69 at 4-5.  It is undisputed that Defendants failed to inform and warn anyone at CSA or any of the longshoreman of the "infested" dunnage or use of cardboard to seal the bottom of Hold No. 4.  Docs. 61 at 3; 69 at 5.

Mr. Bass was a contract employee of CSA and worked as a stevedore.  On January 7, 2019, Mr. Bass reported to the Metro Cruise Terminal in Mobile, Alabama to begin stevedoring operations on the M/V STAR ISFJORD.  Mr. Bass was working in a different cargo hold when he was instructed to move to the tween deck of cargo Hold No. 4 to assist three other longshoremen. in laying paper or cardboard on the tween deck, which is customary to protect a stow of white fluff against dirt and damage.  Doc. 69 at 5 (citing Plaintiff's deposition, Doc. 69-9).  The CSA foreman notified the four longshoremen in Hold No. 4 to "take cover" for incoming cargo.  Accordingly, Mr. Bass sought shelter in the access ways to get out from under the suspended loads of cargo. Doc. 62-4 at 3.  The parties have different accounts of what happened next and, as is required, the Court views the facts in the light most favorable to the Plaintiffs.

According to Plaintiffs, around 11:00 p.m., Mr. Bass walked from the tween deck into the stairwell landing adjacent to the tween deck of cargo Hold No. 4.  Mr. Bass states being aware of "horror stories" involving suspended cargo falling and made sure to comply with the "take cover" command.  Doc. 62-4 at 3.  Mr. Bass entered the archway for safety.  *Id.*  He expected there to be a solid landing floor as he stepped down from the raised tween deck.  Instead of a solid landing floor, he stepped on the cardboard covering the manhole and fell 12-15 feet.  According to

Defendants, it is unclear whether Mr. Bass lost footing and slipped or whether he stepped onto the cardboard covering the opening for the access ladder.  Doc. 61 at 4.  After the accident, Mobile Fire Rescue arrived.[1]  Plaintiff's response notes that immediately after Mr. Bass' accident, the crew of the STAR ISJFORD replaced the cardboard covering the access ladder with plywood, and eventually replaced the plywood with a yellow and black metal cover that reads, "Do Not Step On."  Doc. 69 at 7.

Following the accident, Mr. Bass has suffered a loss of feeling in his extremities. On January 9, 2019, Mr. Bass underwent a seven (7) level cervical fusion and a four (4) level cervical laminectomy by Dr. Ninh Doan at University of South Alabama Hospital.  Doc. 69-14, Dr. Doan Operative – Omni Report.  On October 10, 2019, Dr. Alexis Waguespack removed problematic hardware from Mr. Bass' cervical spine.  Doc. 69-15 at 1-2.  On March 10, 2020, Dr. Waguespack performed a four (4) level anterior cervical fusion with instrumentation from C4-T1.  *Id.* at 3-4.  Mr. Bass sustained a traumatic brain injury and diffuse axonal injury, with spinal fluid that continues to drain from his nostrils.  Doc. 69-16, Dr. Koga's Report.  Since the accident, Mr. Bass remains under the care of psychologists, psychiatrist, neurosurgeons, orthopedic surgeons, and

---

[1] Defendants note that Mr. Bass' account of what happened that is in the Prehospital Care Report is not consistent with his account of what happened in his deposition.  Specifically, it is unclear whether Mr. Bass slipped then fell or if he was stepping down.  Doc. 61 at 5.  According to the Prehospital Care Report, Mr. Bass was stepping over a hole when his foot slipped, then he banged into several landings on the way down.  Mr. Bass states he lost consciousness after the fall.  After he woke, he pulled himself up from the hole.  Doc. 62-5, Prehospital Care Report Summary at 4.  According to Defendants, neither Mr. Bass nor any other longshoremen employed by CSA ever voiced any concern that the lighting in Hold No. 4 or the access way was inadequate.  Doc. 62-3, Taylor Depo. at 10-11.  Defendants state that the longshoremen's employer, CSA, holds the responsibility to provide adequate lighting to the longshoremen, as evidenced by the Superintendent Safety Check List which list "Adequate Illumination for Night Operation" as an item on the check list.  *Id.* at 14; Doc. 62-8.  However, for the purposes of a summary judgment motion, the Court must view the facts in the light most favorable to the Plaintiff, so even inconsistencies here must be resolved in Plaintiff's favor on a summary judgment motion made by the Defense.

brain injury specialists.  Doc. 69 at 8.  According to Plaintiffs, Mr. Bass is permanently disabled, will incur significant future life care expenses, and has suffered a substantial wage loss and diminished earning capacity.

**B.    Procedural Background**

Plaintiffs filed their original complaint on January 6, 2020, pursuant to 33 U.S.C. § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA").  Doc. 1.  On July 14, 2020, Plaintiffs filed an unopposed amended complaint wherein they correctly identify the Defendants by their proper names but maintained the same claims.  Doc. 29.  Mr. Bass asserts claims of negligence, gross negligence, and wanton conduct by asserting Defendants failed to provide Mr. Bass with a safe place in which to work, failure to warn, failure to warn Mr. Bass of the dangerous and unsafe conditions of the vessel, breaching the turnover duty, breaching the active control duty, failure to intervene, failure to rope off or barricade an open hole, and other acts of negligence generally.  Mr. Bass seeks past, present, and future: medical expenses, pain and suffering and loss of function, emotional and mental pain and suffering, lost wages and diminished earning capacity, loss of enjoyment of life, permanent injury and disfigurement, special care and services, and punitive damages.  Mrs. Bass asserts a claim and damages for a loss of consortium. Finally, in the amended complaint, Plaintiffs seek a jury trial, compensatory and punitive damages, and attorney's fees, costs, and interest.  *Id*.

On July 17, 2020, Defendants filed a motion to strike Plaintiffs' jury demand because Plaintiffs' claims are admiralty claims that are not entitled to the right to a trial by jury.  Doc. 30. On July 30, 2020, Plaintiffs filed a consent motion expressing no opposition to Defendants' motion to strike.  Doc. 32.  Accordingly, the Court granted Defendants' motion on July 31, 2020.  Doc. 31.  Accordingly, this case is a non-jury action under admiralty, maritime, and prize cases.  On

August 5, 2020, Defendants filed an answer to the amended complaint.  Doc. 34.

On October 5, 2021, Defendants filed a motion for summary judgment and alternative motion for partial summary judgment.  Doc. 61.  On October 26, 2021, Defendants filed a supplemental brief on the standard of liability for punitive damages. Doc. 66.  Plaintiffs filed a response in opposition on November 12, 2021, and Defendants filed a reply on November 19, 2021.  Docs. 69, 72.  On January 4, 2022, Defendants filed two motions to exclude Plaintiffs' expert testimony and opinions.  Docs. 83, 84.  On January 28, 2022, Plaintiffs filed responses to each motion.  Docs. 90, 91.  On February 7, 2022, Defendants filed a reply to each response. Docs. 94, 95.  The Court previously issued a separate memorandum opinion and order for the motions to exclude.  Doc. 99.  The motion for summary judgment is ripe for adjudication and the Court finds that no oral argument is needed.

### III.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  "[T]he substantive law will identify which facts are material." *Id*. at 248, 106 S. Ct. at 2510.  At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Id*. at 249, 106 S. Ct. at 2511.  The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  An issue is genuine if the

evidence is such that a reasonable jury could return a verdict for the non-moving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)).  For factual issues to be considered genuine, they must have a real basis in the record.  *Id.*

The party asking for summary judgment bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23, 106 S. Ct. at 2252.  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal quotations omitted)

(citing *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553). The court must view facts and draw all reasonable inferences in favor of the non-moving party. *Moore v. Reese*, 637 F.3d 1220, 1231 (11th Cir. 2011) (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)). However, to avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citations omitted). Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likely insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).

## IV.   DISCUSSION AND ANALYSIS

Defendants move this Court to enter summary judgment in their favor on all claims asserted by Plaintiffs, or in the alternative, to enter partial summary judgment on Mr. Bass' claim for punitive damages. Doc. 61. The Court will address the motion for summary judgment and the motion for partial summary judgment in turn.

### A.   Defendants' Motion for Summary Judgment

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96, 114 S. Ct. 2057, 2062, 129 L. Ed. 2d 78 (1994). "The statute was amended in 1972 to permit a longshoreman to seek damages in a third-party negligence action against the owner of the vessel on which he was injured." *Troutman v. Seaboard Atlantic, Ltd.*, 958 F.3d 1143, 1146 (11th Cir. 2020) (internal quotations and citations omitted)). "A harbor worker whose injury is caused by the negligence of

a vessel, or such harbor worker's personal representative, may bring an action against the vessel under 33 U.S.C. Section 905(b)." *Brizo, LLC v. Carbajal*, No. 20-11204, 2021 U.S. App. LEXIS 32400, at *8, 2021 WL 5029390, at *3 (11th Cir. Oct. 29, 2021). The remedy provided by the LHWCA is "<u>exclusive of all other remedies against the vessel</u>." § 905(b) (emphasis added). These same amendments "abrogated the shipowner's common-law defenses of assumption of the risk and contributory negligence." *Id*. (citations omitted).

Pursuant to § 905(b), shipowners owe three general duties to longshoremen: "(1) a turnover duty, (2) a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and (3) a duty to intervene." *Troutman*, 958 F.3d at 1146-47 (quoting *Kirksey v. Tonghi Mar.*, 535 F.3d 388, 391 (5th Cir. 2008)); *see also Howlett*, 512 U.S. at 98, 114 S. Ct. at 2063) (discussing the three duties and citing *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 167, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981)).

> The turnover duty requires a vessel to "'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'" *Howlett*, 512 U.S. at 98, quoting *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-417, n.18, 89 S. Ct. 1144, 22 L. Ed. 2d 371 (1969). The active-control duty requires a shipowner to exercise reasonable care to prevent injuries to harbor workers in areas that are under the shipowner's active control. *Id*. The duty to intervene requires a shipowner to intervene if "during [contractor] operations, the shipowner becomes aware that the ship or its gear poses a danger to the [worker] and that the [contractor] is failing, unreasonably, to protect the [worker]." *Clark v. Bothelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986).

*Brizo*, 2021 U.S. App. LEXIS 32400 at *10-22, 2021 WL 5029390, at *4. Plaintiffs assert claims that implicate all three duties. *See* Doc. 29 at 3-4; Doc. 69 at 9.[2] Therefore the Court will address

---

[2] Defendants argue in the motion for summary judgment that Plaintiff argues turnover duty and active control and focused primarily on turnover duty. Yet a review of the complaint does show

all three in turn.

### i. Turnover Duty

Under the turnover duty, a ship owner has two corresponding duties. The first duty of a shipowner to a longshoreman concerns the period just prior to the onset of cargo operations, in that the vessel and its equipment must be in reasonably safe condition and stevedores must be warned of hidden dangers. *Lampkin v. Athene Transport Co., Ltd.*, 823 F.2d 1497, 1501 (11th Cir. 1987). First, "under the 'duty of safe condition,' the shipowner must exercise 'ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.'" *Troutman*, 958 F.3d at 1146 (citations and internal quotations omitted). "Second, the ship owner has a 'duty to warn' the longshoreman 'of any hidden dangers of which the shipowner knows or should know." *Id.* (citations and internal quotations omitted). The duty to warn is a corollary to the duty of safe condition. *Id.* (citing *Howlett*, 512 U.S. at 98). However, the duty to warn is narrow and does not include dangers which are either (1) open and obvious, or (2) which an expert and experienced stevedore contractor should anticipate encountering. *Barton v. Hai Feng 1710 Designated*, 533 F. Supp. 3d 1372 (S.D. Ga. 2021); *Dukes v. Millennium Ocean Shipping Co.*, 4300 F. Supp. 3d 1372, 1329 (S.D. Ga. 2019); *In re Knudsen*, 710 F. Supp. 2d 1252, 1274 (S.D. Ala. 2010).

Defendants contend that they did not breach the turnover duty because the hazard of the cardboard covered manhole was open and obvious. Doc. 61 at 10-12. Defendants reason that Mr.

---

that all three are discussed though the first two are discussed in more detail. Further, the response to summary judgment addresses all three and the reply in turn discusses them. The Court finds that all three have been implicated by the claims. What the parties may or may not have focused on in discovery is only part of the story – the claims are controlled by the pleadings.

Bass knowingly entered the dark and unfamiliar area where the manhole was covered with cardboard. Defendants posit that Mr. Bass could have avoided his injuries by using a flashlight, asking for additional lighting in the hold, or stepping into a different area. *Id*. at 12.

In response, Plaintiffs argue that Defendants breached the duty to turnover by failing to warn CSA or Mr. Bass that they created a "false floor" by covering the manhole in the stairwell landing of Hold No. 4. Plaintiffs argue that it is clear Captain Montalban and Chief Mate Abrantes failed to inform CSA Superintendent Malachi Ojeda, the longshoremen, or anyone else with CSA about the cardboard in the stairwell on Hold No. 4. Doc. 69 at 10-11. In Captain Montalban's deposition, he states that he expected Chief Mate Abrantes to tell the stevedores about the cardboard covering the manhole. Doc. 69-6 at 8. Chief Mate Abrantes stated that this was the first time he ever put cardboard over a manhole on a vessel. Doc. 69 at 14. Plaintiffs dispute Defendants' argument regarding the hazard being open and obvious. Plaintiffs reason that the lighting was not the cause of Mr. Bass' accident which they contend was a result of the cardboard covering the manhole. *Id.* at 19.

In their reply brief, Defendants acknowledge that CSA was not advised of the sealed tween deck or access way at the turnover on the M/V STAR ISFJORD. Doc. 72 at 2. However, they argue it is not controlling nor dispositive and reiterate that it is unreasonable for an expert and experienced stevedore to step into a dark and unfamiliar area. *Id.* at 3.

Under the LHWCA, the stevedoring company and the longshoreman have primary responsibility for avoiding hazards they should have anticipated. *Troutman,* 958 F.3d at 1147. However, the problem that Defendants have here is that regardless of the lighting (adequate or otherwise), the issue is whether Mr. Bass could have been aware that there was a hole being covered by the cardboard at the very base of a set of stairs – i.e., a false floor. It is clear that there

are places throughout the ship where cardboard is placed on the ground where it is safe to step. *See* Doc. 69 at 5. Therefore, in viewing the evidence in the light most favorable to the Plaintiffs, regardless of the lighting, the evidence is such that it is possible even in a well-lit area, the cover itself would not have been an open and obvious hazard when there were no other visible signs such as signs, tape, barricades, or other visual markers. Therefore, the lack of lighting may or may not have changed that situation. Whether the tween deck stairwell landing made of cardboard covering a 12 – 15-foot-deep manhole, was open and obvious is a genuine issue of material fact. Whether an expert and experienced stevedore contractor should anticipate encountering the cardboard covered manhole is also a genuine issue of material fact. Additionally, as noted in the prior opinion, the Court finds that aspects of the 3D Marine Experts report and testimony may be relevant to a negligence claim. That report notes several breaches and violations related to the placing of the cardboard over an opening at a stairwell landing. At this stage, considering the evidence in the light most favorable to Mr. Bass, the Court finds that motion for summary judgment is due to be denied for both aspects of turnover duty as there are disputed issues of fact regarding whether a reasonably competent stevedore would know of this danger.

### ii.    Active Involvement/Control

Next, the Court considers the second duty established under *Scindia*. Under this duty, once the stevedore's operations have begun, a vessel owner may be held liable (1) "if it actively involves itself in the cargo operations and negligently injures a longshoremen," or (2) "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167, 101 S. Ct. at 1622. This concerns the situation during cargo operations in which the shipowner is actively involved itself in the cargo operations and fails to exercise due care or

warn the longshoreman of areas or equipment under the active control of the vessel during stevedoring operations. *Lampkin*, 823 F.2d at 1501 (quotation omitted). "While it is true that *Scindia* itself does not define active involvement in cargo operations, it makes clear that once control over the vessel is relinquished 'primary responsibility for the safety of the longshoremen lies with the stevedore.'" *Miller v. Navalmar (UK) Ltd.*, 685 F. App'x 751, 755 (11th Cir. 2017) (citations omitted). The Supreme Court has carefully explained at least some level of involvement in cargo operations does not automatically generate a duty on behalf of the shipowner. *Howlett*, 512 U.S. at 103, 114 S. Ct. at 2066 (noting that even though the vessel and its crew maintain some involvement in the cargo loading and storage process "[i]t is settled maritime custom and practice that the stevedore exercises primary control over the details of a cargo operation").

"To state an active control duty claim, a plaintiff must show that the vessel owner substantially controlled or was in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook." *Washington v. Nat'l Shipping Co.*, 374 F. Supp. 3d 1339, 1357 (S.D. Ga. 2019) (quotations and alterations omitted). "Where cargo operations have begun and the shipowner is not actively involved, it must have actual knowledge of the hazard before it may be held liable." *Lampkin*, 823 F.2d at 1501. More to the point, the second *Scindia* duty can be broken down in two ways: active involvement duty and active control duty.

Plaintiffs contend that Defendants had control of the stairwell and ladder well and could have anticipated the harm. Doc. 69 at 20-21. Plaintiffs reason that Defendants were in the best position to anticipate the harm because they knew about the cardboard covered manhole (since they placed it there), whereas Plaintiffs were not aware. Further, they turned over the cargo holds to the stevedores, not the stairwells and ladder wells. *Id.* at 21. Finally, the M/V STAR ISFJORD

crew was under an U.S. Department of Agriculture Emergency Action Notification to quarantine and seal the hold containing the contaminated cargo and safeguard the area that was sealed.  *Id.* (citing Emergency Action Notification, Doc. 69-1).

Defendants, in their reply, argue the vessel has no duty to supervise or inspect the cargo operations because the primary responsibility for the safety of longshoremen rest with the employer – in this case, CSA.  Doc. 72.

In this case, the issue ultimately is who substantially controlled or was in charge of (i) the area in which the hazard existed and (ii) the instrumentality which caused the injury as there is no apparent debate on whether the ship crew directed the specific activities CSA and its stevedores took.  The parties clearly dispute who maintained active control of the ladder well and/or stairwell. Moreover, it is undisputed that the ship's crew was actively involved in placing the cardboard over the hole to seal the contaminated cargo.   "Active involvement in and of itself does not automatically translate into liability; the active involvement must constitute negligent behavior." *Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F.Supp.2d 294, 302 (E.D. N.Y. 2001).  The Court finds that there is a genuine dispute of material facts as to whether the crew's involvement in sealing the hole constituted negligent behavior that proximately caused Mr. Bass' accident. Specifically, the evidence shows that the ship's crew received the Emergency Action Notification which required them to seal off the contaminated cargo and ensure it would not be opened while operating in U.S. territory (port or waters).  The evidence viewed in the light most favorable of the Plaintiffs would permit a reasonable fact-finder to conclude that the involvement of the vessel's crew in placing the cardboard in the area and failing to place any warnings could constitute negligence.  It also could be construed that the ship and its crew were in charge of the area – it could likewise be construed otherwise.  But as a result, that is a factual matter that cannot be

resolved on summary judgment.  Therefore, summary judgment is denied.

      **iii.**    **Duty to Intervene**

Finally, the third *Scindia* duty requires that a shipowner has a duty to intervene and protect a longshoreman once cargo operations have begun even if it is not actively involved in those operations if "[the shipowner] becomes aware that the ship or its gear poses a danger to the longshoremen and that the stevedore is failing, unreasonably, to protect the longshoremen." *Lampkin*, 823 F.2d at 1501 (quoting *Clark v. Botelho Shipping Corp.*, 784 F.2d 1563, 1565 (11th Cir. 1986)).  "Importantly, a shipowner only has 'a duty to intervene when it has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of obviously improvident judgment, has failed to remedy it." *Miller*, 685 F. App'x at 757 (quoting *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1248 (5th Cir. 1997)) (internal quotations omitted).

Plaintiffs also argue Defendants failed to intervene when required, but only make a generic argument that Defendants had a duty to intervene for all the reasons previously set forth. Specifically, that Defendants had knowledge of the dangerous condition (the open manhole covered with cardboard) and had a duty to prevent anyone from using the stairwell.   However, this argument fails.   While the evidence, for summary judgment purposes, may be construed in favor of the Plaintiffs on the first part of the duty to intervene (actual knowledge of a dangerous condition), there is no evidence that the Defendants had actual knowledge that Mr. Bass (or any other stevedore) exercised obviously improvident judgment until <u>after</u> the accident.  *See, e.g., Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1582 (11th Cir. 1988) (no duty to intervene arose in part because the ship had not received "any complaint" regarding the cargo operation); *Washington*, 374 F. Supp. 3d at 1359 (holding Defendant could not rise to a duty to intervene when Defendant was never notified that the stevedores utilized a defected tractor and trailer); *see also*

*Bonds v. Mortensen & Lange*, 717 F.2d 123, 127-28 (4th Cir. 1983) (no duty to intervene where malfunction of bell was obvious and known to all, and "the longshoremen proceeded to unload the ship's cargo without complaint or incident until the time of the accident").  It was only after Mr. Bass fell through the cardboard covering the manhole cover that Defendants were put on notice of the stevedore's actions.

Therefore, summary judgment is granted as to the duty to intervene negligence claim.

**B.      Punitive Damages and Loss of Consortium Claims**

Defendants, in the alternative motion for partial summary judgment, argue that Mr. Bass' claims for punitive damages should be dismissed because there is no evidence demonstrating the requisite culpability, such as a showing of intentional or wanton and reckless conduct that is required for the assessment of exemplary damages.  *See In re Amtrak Sunset Ltd. Train Crash in Bayou Cabot, Ala. on Sept. 22, 1993*, 121 F.3d 1421, 1427-28 (11th Cir. 1997) ("[P]laintiffs cannot recover punitive damages for simple negligence as punitive damages require a showing of intentional or wanton and reckless conduct on the part of the defendants amounting to a conscious disregard of the rights of others." (internal quotations omitted)).  Defendants reason that there was no intentional, wanton, or reckless conduct in making the decision to cover the access way opening. Doc. 61 at 15.  According to *Amtrak*, "personal injury claimants have no claim for non-pecuniary damages such as…punitive damages, except in exceptional circumstances such as…intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of intentional wrongdoing."  *In re Amtrak*, 121 F.3d at 1429.

However, as noted by Plaintiff, it is questionable whether *Amtrak* remains good law in light of the Supreme Court's decision in *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009).  Prior to *Atlantic Sounding*, the Eleventh Circuit was clear:

punitive damages were not an available remedy for personal injury actions brought pursuant to general maritime law, except for actions based on intentional wrongdoing.  In *Amtrak* the Eleventh Circuit stated:

> Unless or until the United States Supreme Court should decide to add state remedies to the admiralty remedies for personal injury, personal injury claimants have no claim for nonpecuniary damages such as . . . punitive damages, except in exceptional circumstances . . . .

*Id*.

But in *Atlantic Sounding*, the United States Supreme Court held that a seaman could, under general maritime law, get punitive damages for his employer's willful and wanton disregard of its maintenance and cure obligation.  *Atlantic Sounding*, 557 U.S. at 424, 129 S. Ct. at 2575.  Although the plaintiff's claim in that case was for failure to pay maintenance and cure, the Court's rationale was broad: (1) that "punitive damages have long been available at common law," (2) that "the common-law tradition of punitive damages extends to maritime claims," and (3) that "nothing in the Jones Act altered this understanding." *Id*. at 414, 424, 129 S. Ct. at 2569, 2575.  In short, it seemed to recognize that punitive damages that were available at common law for wanton, willful, or outrageous conduct traditionally have been extended to claims arising under federal maritime law.  *Id*. at 409-411, 129 S. Ct. at 2566-2568.  Yet, "[u]nder the prior precedent rule, [the Court is] bound to follow a prior binding precedent 'unless and until it is overruled by this court en banc or by the Supreme Court."  *United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) (quoting *United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003)).  For the Supreme Court to overrule a binding Eleventh Circuit decision, the Supreme Court opinion "must have actually overruled or conflicted" with the Eleventh Circuit decision. *Id*. at 1237.  And "[t]here is a difference between the holding in a case and the reasoning that supports that holding." *Id*.  So "[e]ven if the reasoning of an intervening high court decision is at odds with a prior appellate court

decision, that does not provide the appellate court with a basis for departing from its prior decision." *Id*.

A rift has since developed among the district courts about *Atlantic Sounding* and its effect on *Amtrak*. Some courts read this holding to find that Congress has not enacted any legislation limiting the recovery of punitive damages in a personal injury action brought under general maritime law. *See, e.g., Vairma v. Carnival Corp.*, Civ. Act. No. 15-20724, 2015 U.S. Dist. 188952, 2015 WL 12911465 (S.D. Fla. May 27, 2015). But other courts find that it did not explicitly overrule or abrogate *Amtrak*. *See, e.g., Ginley v. Dutra Dredging Company*, Civ. Act. No. 19-23487, 2020 U.S. Dist. LEXIS 115404, 2020 WL 13379369 (S.D. Fla. Jun. 30, 2020) (discussing that it was bound to follow *Amtrak* under the prior precedent rule).

Amid this dispute, there are also two separate panel opinions – albeit unpublished – from the Eleventh Circuit that both explicitly hold that *Atlantic Sounding* does not undermine at least some of the holding in *Amtrack* but both cases are in the context of a loss of consortium claim. *See Eslinger v. Celebrity Cruises, Inc.*, 772 F. App'x 872 (11th Cir. 2019); *Petersen v. NCL (Bah.), Ltd.*, 748 F. App'x 246 (11th Cir. 2018). Specifically, *Petersen* noted that nothing in the *Atlantic Sounding* opinion undermines *Amtrak* holding that punitive or loss of consortium damages may only be available under federal maritime law "in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman[.]" *Petersen*, 748 F. App'x at 252. *Eslinger*, on the other hand, notes that the *Atlantic Sounding* opinion had no application to loss of consortium claims – seemingly dodging the punitive damages discussion. *Eslinger*, 772 F. App'x at 873.

Finally, wedged in between these two panel opinions, the Supreme Court issued its opinion in *The Dutra Grp. v. Batterton* wherein it limited the availability of punitive damages for certain maritime claims. 139 S. Ct. 2275, 204 L. Ed. 2d 692 (2019). In *Batterton*, the Supreme Court

distinguished *Atlantic Sounding* in holding that a mariner could not recover punitive damages on a claim that he was injured as result of the unseaworthy condition of a vessel. *Id.* at 2283–84.  The Court explained that "[i]n *Atlantic Sounding*, we allowed recovery of punitive damages, but we justified our departure from the statutory remedial scheme based on the established history of awarding punitive damages for certain maritime torts, including maintenance and cure" but that "[f]or claims of unseaworthiness, the overwhelming historical evidence suggests that punitive damages are not available." *Id.* at 2283.

Finally, looking outside the Eleventh Circuit, the Court finds yet more confusion which seems to indicate the majority of other courts outside our circuit find that punitive damages are recoverable.  *See, e.g., Kahumoku v. Titan Maritime, LLC*, 486 F. Supp. 2d 1144 (D. Haw. 2007) (Congressional silence as to punitive damages in § 905(b) indicates the intent for the remedy to remain available under maritime law); *Bommarito v. Belle Chasse Marine Transp.*, Civ. Act. No. 21-204, 2022 U.S. Dist. LEXIS 103830, 2022 WL 2149445 (E.D. La. Jun. 10, 2022) (citing *In re Rodi Marine LLC*, Civ. Act. No. 17-5394, 2019 U.S. Dist. LEXIS 28382, 2019 WL 861251, at *3 (E.D. La. Feb. 22, 2019)) (finding punitive damages may be recoverable in LHWCA claims); *Lopez v. United States*, Civ. Act. No. 15cv180, 2017 U.S. Dist. LEXIS 236507, 2017 WL 11662686 (S.D. Cal. Mar. 13, 2017) (same); *Callahan v. Gulf Logistics, LLC*, Civ. Act. No. 6:06-cv-561, 2013 U.S. Dist. LEXIS 133050, 2013 WL 5236888 (W.D. La. Sep. 16, 2013) (same); *Summers v. Salmon Bay Barge Line, Inc.*, Civ. Act. No. 12-5859, 2013 U.S. Dist. LEXIS 157914, 2013 WL 5912917 (W.D. Wash. Nov. 4, 2013) (same).  Yet, in *Exxon Mobil Corp. v. Minton*, 285 Va. 115, 135, 737 S.E.2d 16 (2013), the Supreme Court of Virginia held that the statutory language of § 905(b), which states that "[t]he remedy in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this [Act]" necessarily requires the

finding that "punitive damages are not a remedy made available within the terms of the LHWCA[.]"

The law with regard to punitive damages under LHWCA claims is clearly in a state of flux, or put more bluntly, it's a mess. As noted by our sister court in Florida, "[b]oth the pro-*Amtrak* cases and the pro-*Atlantic Sounding* cases raise good points." *Ginley*, 2020 U.S. Dist. LEXIS 115404, at*7, 2020 WL 13379369, at *3. With that backdrop of confusion, the Court proceeds with the discussion on the loss of consortium claim and punitive damages.

As to the loss of consortium claim, the Court finds that much like the two unpublished Eleventh Circuit opinions discussed, *Atlantic Sounding* did not appear to affect Eleventh Circuit precedent and therefore, summary judgment is due to be granted on that claim. Further, given that two separate panels reached identical conclusions, the Court finds their analysis persuasive. Consequently, the loss of consortium claim is dismissed which also means Mrs. Bass is dismissed as a plaintiff in this matter.

Turning to punitive damages, even in its own motion for summary judgment, Defendants note "[w]hile the 'common-law tradition of punitive damages extends to maritime claims,' such damages are only available 'under maritime law where the defendant's conduct is wanton, willful, or outrageous." Doc. 61 at 15 (quoting *White v. Fincantieri Bay Shipbuilding*, 429 F. Supp. 3d 582, 588 (E.D. Wis. 2019) (quoting *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414 (2009); *Holden v. Capstan Corp.*, 2018 WL 5618107, at *15 (W.D. Wis. Oct. 30, 2018)) (internal quotation marks omitted)). Defendants then move on to quote from *Amtrak* that punitive damages require "a showing of 'intentional or wanton and reckless conduct' on the part of defendants amounting to 'a conscious disregard of the rights of others.'" *Id.* (quoting *Amtrak*, 121 F.3d at 1427-28)). Defendants also filed a supplemental brief expanding its analysis on the standard of

liability for punitive damages under General Maritime law by arguing that *Amtrak* still stands as the standard which requires a showing of intentional misconduct for punitive damages.  Doc. 66.

In its reply, Defendants take a stronger stance in "their position that punitive damages are unlikely to be recoverable by longshoremen in a 905(b) action."  Doc. 72 at 11.  But, Defendants then argue that "[t]his issue does not need to be decided in the case at bar, however, because the Eleventh Circuit guidance is clear as to the standard applicable to non-seamen punitive damages claims" because *Amtrak* makes it clear that a showing of intentional conduct is required.  *Id.* at 13. They argue Plaintiff makes no such assertion in the Amended Complaint.

Plaintiff, in his response in opposition to summary judgment, counters by arguing *Amtrak* has been overruled and in maritime cases, the standard is "wanton, willful or outrageous conduct" not "intentional misconduct."  Doc. 69 at 27.  Plaintiff then cites *Kennedy v. Carnival Corp.*, 385 F. Supp. 3d 1302 (S.D. Fla. 2019) to support his proposition.  Yet, *Kennedy* itself holds that *Amtrak* was not overruled or abrogated by *Atlantic Sounding*.  385 F. Supp. 3d at 1328-29.  The *Kennedy* court notes

> The real issue, it appears, is not whether punitive damages are available under general maritime law, they are, but what standard of liability should apply in determining whether punitive damages may be recovered for a particular maritime claim. An overly broad reading of Atlantic Sounding would make punitive damages available even in the absence of a showing of intentional misconduct. However, the Court believes that Atlantic Sounding's statement that "[p]unitive damages have long been an available remedy at common law for wanton, willful or outrageous conduct" was simply a general description of the circumstances in which such damages are available at common law, and was not intended to announce a bright-line standard of liability governing recovery of punitive damages in all maritime tort claims. Again, the Court notes that Atlantic Sounding addressed only the availability of punitive damages in a cause of action for maintenance and cure, and did not specifically discuss personal injury claims brought by ship passengers. Given the relatively narrow scope of the issues presented in Atlantic Sounding, the Court does not believe that holding should be read so broadly as to find it in conflict with Amtrak. Therefore, the Court finds that Amtrak is controlling on this issue, and Plaintiffs in this action may recover punitive damages only upon a showing of intentional misconduct.

*Id.* at 1329 (quoting *Crusan v. Carnival Corp.*, 2015 U.S. Dist. LEXIS 191522, 2015 WL 13743473, at *7 (S.D. Fla. Feb. 24, 2015)).  Plaintiff quotes *Kennedy* when it states, "to demonstrate intentional misconduct, the plaintiff must show 'the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct.'"  *Id.* at 1329 (quoting *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1220 (11th Cir. 2010) which in turn quotes Fla. Stat. §768.72(2) (2005)).  Plaintiff essentially notes that gross negligence and intentional misconduct are a "distinction without a difference" as he does not have to prove "defendants intentionally injured Mr. Bass, only that their actions, which ultimately caused his injuries, were deliberate, with knowledge that those actions had a high probability to cause serious injury."  Doc. 69 at 27-28.

Defendants are correct in that there is no place in the Amended Complaint that Defendants acted with the intent to cause him harm – rather it focuses on gross negligence and/or wanton conduct.  Yet, given the tortured status of the law, the Court is not entirely convinced at this stage that it can make a finding that the facts are undisputed under either reading of the liability standard.  Moreover, many of the cases relied upon relate to an interpretation of Florida law in a maritime context on intentional misconduct and gross negligence.  However, rather than making an outright ruling at this stage, the Court will grant the parties joint motion for a status conference (Doc. 98).  At the status conference the Court will discuss the remaining logistics for the case to include oral arguments on punitive damages, scheduling the bench trial (likely December 2022), and other pretrial deadlines.  Additionally, the Court will hear argument on whether the bench trial could be bifurcated into a trial on liability followed by, if necessary, a trial on damages which could negate entirely the need for a preemptive ruling on whether punitive damages are recoverable or not.

## V.    CONCLUSION

Based on the foregoing discussion and analysis, the Defendants' motion for summary judgment (Doc. 61) is **GRANTED in part** and **DENIED in part**. It is granted as to the loss of consortium and duty to intervene negligence claims.  It is denied as to turnover duty and active involvement/control.

The Court also **GRANTS** the *Joint Motion for Status Conference* (Doc. 98) to discuss trial setting and related logistics as to the remainder of this case as well (including scheduling oral arguments on the claim for punitive damages).  A status conference is scheduled for **Thursday, October 13, 2022 at 2:00 p.m.** in Courtroom 3B of the United States Courthouse, 155 St. Joseph Street, Mobile, AL 36602.

**DONE** and **ORDERED** this the 28th day of September 2022.

 s/Terry F. Moorer_____
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE