IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PATRICK BASS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 20-0007-TFM-MU |
| ) | |
| M/V STAR ISFJORD, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion to (1) Enforce Settlement Agreement and (2) Compel Execution of Release. (Doc. 174). This motion has been referred to the undersigned Magistrate Judge for entry of a report and recommendation. Defendants have moved to enforce their oral settlement agreement, which was confirmed on the record, with Plaintiffs Patrick and Jocelyn Bass. Having considered the motions, responses filed by Plaintiffs Patrick and Jocelyn Bass, the response filed by Plaintiffs' trial counsel, the reply filed by Defendants, the testimony and arguments presented at the evidentiary hearing conducted before the undersigned on April 11, 2024, and the relevant law, the Court finds the motion to enforce settlement is due to be **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

After proceeding through eight days of a non-jury trial of this action, the parties agreed to a settlement of the case near the end of Defendants' evidentiary presentation. See Docket Sheet dated 10/30/23 – 11/8/23. The key terms of the settlement were put on the record and recorded by the Court Reporter. (Doc. 174-1). Specifically, the parties

agreed as follows:

> MR. SHREVE: The settlement will include payment to plaintiffs in the amount of $Redacted.[1] This is a full and final settlement of all claims and all causes of action whether pleaded or not.
>
> MR. HUFFT: Also be included Jocelyn Bass's claim for consortium that the judge had previously dismissed.
>
> MR. SHREVE: The release terms of the settlement are to be agreed upon by the parties. The settlement will be confidential and will be subject to confidentiality provisions to be included in those releases. There will be a standard MSA completed in conjunction with this settlement. Standard indemnity provisions in favor of the defendants. The parties will bear their own costs and attorneys' fees. Any and all liens will be covered by the plaintiff. This is a full dismissal of this action with no right to appeal.
>
> MR. KAVANAGH: With prejudice.
>
> MR. SHREVE: With prejudice.

(Doc. 174-1 at 2-3; PageID. 1574-75).

Mr. Hufft, trial counsel for Mr. and Mrs. Bass, wanted to poll his client (Mr. Bass) to make sure he agreed to the settlement. Accordingly, the following continued on the record:

> MR. HUFFT:  Just for the record before me is Patrick Bass, the plaintiff, along with his wife, Jocelyn Bass. I just want for the record for the assent from the both of you guys that you are entering into a settlement for $Redacted. That would be the general terms of a release.
>
> It will also have a confidentiality provision as we discussed. There will be a requirement for us to deal with an MSA, as we have discussed previously. And I just want to get your consent that this is a full and final settlement. This is the

---

[1] Because this is a settlement between private parties who agreed to keep the amount of the settlement confidential as a material term of their agreement and because the amount of the settlement is not necessary to a determination of this motion, the Court has found it proper to redact the amount of the settlement here.

2

> end of the case. There is no more appeals. There's no more anything in this case. It includes Jocelyn's claim for loss of consortium that was dismissed in the summary judgment. So all issues are resolved. All issues have been -- will be settled in the release language that we put together.
>
> And I just need y'all's assent. So if you can say you agree. Mr. Bass?
>
> MR. BASS: I agree.
>
> MR. HUFFT: Mrs. Bass?
>
> MRS. BASS: I agree.

(*Id.* at 3-4; PageID. 1575-76).

Thereafter, counsel for Plaintiffs and Defendants worked together to prepare a "Settlement Agreement and Release of all Rights" ("Settlement Agreement"). Final terms were agreed upon and the last version of the Settlement Agreement was provided to Plaintiffs' counsel on December 5, 2023. (Doc. 174-2). After counsel for all parties reached consensus on the Settlement Agreement, Plaintiff Patrick Bass refused to execute the Agreement. The parties reported this impasse to the Court, *see* Doc. 166, and on February 1, 2024, the undersigned held a status conference at which the Court asked Mr. Bass specific questions about his unwillingness to sign the Settlement Agreement after having agreed to the terms orally on the record. (Doc. 171). At the status conference, Mr. Bass indicated to the Court that he did not object to the settlement itself nor did he object to the amount of the settlement, but rather, he objected to language in the document; however, he could not specifically identify the language in the Agreement to which he had objections. (*Id.*).

Because Mr. Bass continued to refuse to sign the Settlement Agreement, Defendants filed the instant motion to enforce the settlement. (Doc. 174). Counsel for

3

Plaintiffs filed a status report in response to this motion in which they stated that the motion to enforce the settlement is "factually and legally correct." (Doc. 177). They stated that "[a] binding settlement was agreed upon, and the terms were read into the record and acknowledged by plaintiffs."  (*Id*.). Plaintiffs' counsel further stated that, after the February 1 hearing, "the only changes to the settlement agreement suggested by plaintiff Patrick Bass did not comport with the terms of the settlement agreement as read into the record [and] Mrs. Bass did not offer any changes." (*Id*.).

Plaintiffs Patrick and Jocelyn Bass did not individually (i.e., separate from their trial counsel) file a timely response to Defendants' motion; however, on March 8, 2024, they filed an unsigned *pro se* "Request to Vacate Order" dated February 28, 2024, in which Patrick Bass stated, for the first time, that, on the date of the oral settlement agreement, he was under the influence of prescribed medications, was told that Defendants came to his counsel with a settlement offer, was told by his attorney that "[t]here's NO MORE NEGOTIATIONS," was advised by his counsel to accept the offer, and did not receive adequate answers from his counsel to his questions or get more explanations, but instead his counsel said, "Don't worry, the language contained in the 'Settlement Offer' is 'Standard and Customary.'" (Doc. 179 at 1; PageID. 1596). Without pointing out any specific facts that were misrepresented by his attorney related to the settlement agreement, Plaintiff Patrick Bass claimed in his Request that his counsel's omission of "all the facts" precluded him from "making an informed decision at the time of consent." (*Id.* at 2; PageID. 1597). Plaintiff Patrick Bass again raised these same general concerns without any specific factual support in an unsigned "motion" the day

4

before the evidentiary hearing on Defendants' motion to enforce the settlement. (Doc. 184).

On April 12, 2024, Plaintiffs Patrick and Jocelyn Bass, trial counsel for Plaintiffs, and counsel for Defendants appeared in person before the Court for an evidentiary hearing on Defendants' motion to enforce the settlement. (Doc. 197). The relevant testimony to the issue presented herein is set forth, as follows:

- Questioning by Attorney Kavanaugh and Answers by Mr. Bass:

    > Q  Are those three medicines – do you take those typically every day, every morning?
    >
    > A   The – typically, the Oxycontin first and foremost, the Diazepam, which typically almost every day – it just depends on my physical ailments. And the Amitriptyline, that's -- typically, I take that overnight. And, of course, depending on my emotional state of mind, mood, I will span that over the course of time. So it just depends on the need with respect to that particular medication.
    >
    > * * *
    >
    > [questioning concerning medications taken during the trial]
    >
    > A  Okay. Let me clarify that – that answer.... But I said out of the three medications, I took the Oxycontin on a regular basis and the Diazepam. The Amitriptyline is on as-a-need basis throughout the course of those days of the trial. That's the one I tried to refrain from as much as possible because it – the way it impacts me even to a greater degree than when combined with the other medication. So just for clarification, that was the routine or course of taking those medications. Now, in addition to that, on the day that – in question that we're here about, I left the trial early because I was not feeling well went – was transported back to the hotel, and I took those medications, two of those medications, the OxyContin along with the Diazepam.
    >
    > Q ... Did you tell your lawyers that you were not in a mental framework within which you could understand the proceedings you were returning to?

5

\* \* \*

A  All right. So yes. I will acknowledge that I did not make mention of that because throughout the five years of these proceedings, it is my understanding that my attorney, Patrick Hufft is fully aware of the extent of which I take my medication due to the severity of my injuries

Q  At any time did you advise the Court of your inability to perhaps understand the settlement agreement?

A  At that particular –

Q  At that time.

A  At that time?

Q  Yeah.

A  No. I did not if I recall.

Q  And, in fact, you remember you came back into court. Judge Moorer wasn't here, but the court reporter was here and you were asked a series of questions about the settlement. Do you recall that?

A  Vaguely I do.

\* \* \*

Q  Was Ms. Bass present during the discussions of this settlement offer at the end of the trial in November of last year? Ms. Bass was present for those discussions, wasn't she?

A  On the day in question?

Q. Yes, sir.

A. We discussed, yes sir.

Q. And you discussed it with your wife, correct? You discussed those terms and that amount with Ms. Bass, correct?

6

A. As it was presented to us.

\* \* \*

Q. Ms. Bass at any time ever indicate, you know, Patrick you may not been in your right mind; let's not do this; let's sleep on it; or let's come back when you're more cognitively aware? Did she ever mention that to you?

A. On the day in question?

Q. On the day in question.

A. No. She did not.

Q. And this is a lady that's been with you every step of the way from the date of the injury up until today. You would agree with me, sir, that she's fully aware of the impact the medication that you take, the impact that it has on you, including your cognitive functions, correct?

A. Yes.

Q. Okay. And she never voiced any concern about your ability to understand what was transpiring, what was taking place on that day, did she?

A. Not that I recall other than she did ask me how you feeling because she knew the reason I left....

\* \* \*

Q. ... This is not the first hearing we've had before Judge Murray. Do you recall coming before him? ... February? Do you remember that prior occasion, sir?

A. Yes.

Q. At that time, if you remember, Mr. Bass, the suggestion was that you didn't like some of the terms of the settlement agreement. If you remember the exchange – I think Judge Murray asked you what specific terms did you not agree with or did you have questions about. Do you remember that?

A. Yes. Yes, I do.

7

> Q  And, sir, I'll represent to you that my notes and my recollection indicate at no time did the issue of your cognitive awareness or your cognitive ability come into play with respect to the settlement agreement. Do you have a different recollection, or would you defer to what the transcript of that hearing shows?
>
> A. At this point, I would defer to the transcript.

(Doc. 197, PageID. 1675-79, 1682-83, 1685-86).

- Questioning by Attorney Mackey and answers by Mr. Bass:

> Q. ... And first time you said anything about your capacity to testify was after the hearing before Judge Murray on February 1[, 2024], correct?
>
> A. Yes.

(Doc. 197, PageID. 1718).

- Questioning by Attorney Kavanaugh and answers by Ms. Bass:

> Q. And did you talk in private with Mr. Bass about the offer?
>
> A. Yes.
>
> Q. Did y'all make a decision to accept the offer?
>
> A. We did.
>
> Q. And did you relay that to Mr. Hufft?
>
> A. Yes.
>
> Q.  And then you saw me go through the settlement discussion with Mr. Bass, coming back into the courtroom in front of the court reporter and going through the terms and the amount, things like that. You also indicted that you agreed in front of the court reporter to the settlement?
>
> A. I did.

(Doc. 197, PageID. 1731).

- Questioning by Attorney Shreve and answers by Attorney Hufft:

8

> Q. Did you, in fact, accept the terms of the settlement after that discussion with them and as reflected in the record?
>
> A. ... [Mr. Bass] never mentioned to me that he was –took medication, didn't understand something. I can't tell what was going on in his mind. But I do know this is that when we have met with him in the past at the Holiday Inn and gone through his preparation and testimony or gone through his understanding of the case, there were times when he would kind of drop off and you could see we were losing him and we would stop and we would say we're going to meet again' this is the end of today. I did not get that indication that day. He was not in that condition. If I did, I would have never done anything....
>
> Q. Mr. Hufft, just to follow up on what you just said, during your conversations with Mr. and Ms. Bass regarding the settlement prior to the colloquy on the record and prior to the acceptance, did you ever get any indication that Mr. Bass did not understand or comprehend what you were saying regarding the settlement?
>
> A. No. I did not.
>
> Q. What about Ms. Bass? Did you ever get any indication that she did not understand or comprehend what you were saying?
>
> A. No. I did not. And I will just say -- I'll add this point: Like, for example, on the confidentiality provision, it wasn't like I'm telling somebody it's confidentiality provision and they look at me and they have no knowledge what I'm talking about. He was specific against it and was arguing that he did not want it. And that's when I came back out, tried to explain that to John. John said -- he talked to Art and said, we want the confidentiality. I went back and said, it's a deal killer. If you want it, y'all talk about it. It's got to be in there. So it's all I can tell you.

(Doc. 197, PageID. 1737-39).

9

> - Questioning by Attorney Mackey and answers by Attorney Hufft:
>
>> Q. And that was early in December when he got that?
>>
>> A. I would think so, yeah.
>>
>> Q. And between then and the hearing on February 1st, did you hear anything from Mr. or Ms. Bass complaining about his lack of capacity due to taking medication?
>>
>> A. No. The only thing that was complained of at that time was that he was denied his rights and under pressure because he didn't get to make a counteroffer. And that's all he said was his basis. That's what he said on February 1st.

(Doc. 197, PageID. 1743).

## II. **LEGAL ANALYSIS**

Defendants assert, and Plaintiffs' counsel (and, based on her testimony, Plaintiff Jocelyn Bass), agree that the parties had an objective meeting of the minds and, therefore, entered a valid settlement agreement on November 8, 2023. (Docs. 174, 197). In response, Plaintiff Patrick Bass contends that the parties did not reach a meeting of the minds as to the final terms of the settlement agreement; however, he has never articulated which term(s) of the agreement he finds disagreeable. (*See, e.g.,* Docs. 179, 197*)*. Patrick Bass further contends that he was under the influence of prescription medication at the time he agreed to the settlement and seemingly avers that he lacked the mental capacity necessary to enter into a settlement agreement because of this. (Doc. 179 at 1-2).

"A district court retains 'jurisdiction to enforce a settlement agreement when . . . a party claims a breach of the settlement agreement before the court has dismissed the

action.'" *Szanto v. Bistritz*, 743 F. App'x 940, 942 (11th Cir. 2018)[2] (quoting *Kent v. Baker*, 815 F. 2d 1395, 1396 (11th Cir. 1987)). "Principles governing general contract law apply to interpret settlement agreements." *Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1350 (11th Cir. 2000) (citations omitted). "When the facts material to the question whether a contract was formed are in dispute, the fact-finder must resolve that dispute." *Walker v. Walker*, 144 So. 3d 359, 364 (Ala. Civ. App. 2013) (citing *Sunnyland Mobile Homes, Inc. v. Thompson*, 384 So. 2d 1111 (Ala. Civ. App. 1980)). "However, when the facts material to the question whether a contract was formed are undisputed, the existence of a contract is a question of law for the court." *Id.* (citing *Denson v. Kirkpatrick Drilling Co.*, 144 So. 86, 91 (Ala. 1932)).

"[T]he basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Sirote & Permutt, P.C. v. Caldwell*, 293 So. 3d 867, 873 (Ala. 2019) (citations omitted); *accord Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London*, 766 F. App'x 795, 801 (11th Cir. 2019). "It is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions." *SGB Const. Servs., Inc. v. Ray Sumlin Const. Co., Inc.*, 644 So. 2d 892, 895 (Ala. 1994). "Conduct of one party from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance." *Id.* (citing *Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260 (Ala. 1983)).

---

[2] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

Here, there is no question that these contractual elements were met. An offer was made and the acceptance of the offer was confirmed on the record by a court reporter. The sole issue for this Court to consider is whether Patrick Bass had the capacity to enter into the settlement agreement on November 8, 2023, for there is no doubt that both Mr. and Mrs. Bass agreed to the settlement amount and the material provisions of the settlement agreement on the record and that the terms contained in the written Settlement Agreement comported with those terms. (Docs. 174, 174-1, 174-2, 177). "Generally speaking, whether one has mental capacity to enter into a contract is a question of fact." *Metro. Life Ins. Co. v. Tucker,* 846 F. App'x 798, 800 (11th Cir. 2021) (citing *Clark v. White,* 185 F.2d 528, 531 (5th Cir. 1950)). The long-standing law in Alabama is that, while a contract can be voided on the grounds of lack of mental capacity, a party to a contract cannot have it voided on this ground without proving that his lack of capacity "was of such character that he had no reasonable perception or understanding of the nature and terms of the contract." *Weaver v. Carothers*, 153 So. 201, 202 (Ala. 1934), *cited in Stricklin v. Am. Cast Iron Pipe Co.,* 373 So. 3d 1097, 1102 (Ala. Civ. App. 2020); *accord Williamson v. Matthews*, 379 So. 2d 1245, 1247 (Ala. 1980) ("[A] party cannot avoid ... a contract on the ground of mental incapacity, unless it be shown that the incapacity was of such character that, at the time of execution, the person had no reasonable perception or understanding of the nature and terms of the contract.").

The facts presented in this case show that Mr. Hufft's testimony was both internally consistent and consistent with extrinsic evidence surrounding the settlement agreement. Mr. Hufft's testimony was also detailed about the events surrounding the

12

offer made by Defendants, the discussion with Mr. and Mrs. Bass, and the acceptance of the settlement offer by the Basses. In addition, Mr. Hufft's testimony concerning Mr. Bass's mental state was detailed and persuasive. Accordingly, the Court finds Mr. Hufft's testimony credible and accords it great weight.

On the other hand, Mr. Bass's testimony was not entirely consistent with the other witnesses' accounts of the events surrounding the settlement agreement. While Mr. Bass argues that he did not have the capacity to enter into the agreement because he had taken Oxycontin and Diazepam earlier in the day, he also testified that he had been regularly taking those medications during the course of the trial and, indeed, on a daily basis for a number of years. Notably, he did not articulate if, or how, those medications inhibited his capacity to understand the terms of the settlement offer. He offered no expert opinion (or any other evidence) concerning how or if those medications could or did affect his ability to understand the terms of the settlement agreement. *See, e.g., TitleMax of Ala., Inc. v. Falligant,* 328 So. 2d 244, 255-56 (Ala. 2020) (rejecting a claim of mental incapacity to contract when there was "no evidence explaining the specifics of [the party's] mental illness or how it affects her mental capacities"). Of note, although Mr. Bass agreed to the settlement agreement on November 8, 2023 and had months of discussions with his attorneys concerning the written settlement document, he never suggested that he lacked capacity or was mentally unable to understand the terms of the agreement until he filed a Request to Vacate Order dated February 28, 2024 in this Court, *after* Defendants filed their motion to enforce the settlement. (Doc. 179).

Having considered the testimony cited above and paid mindful consideration to

13

the demeanor of the witnesses, as well as their conduct before and after the testimony, the Court finds that Mr. Bass has not met his burden of proving that he lacked the mental capacity to perceive and understand the nature and terms of the settlement agreement. The Court further finds that a valid settlement agreement was entered into by the Basses as documented in the colloquy recorded by the court reporter on November 8, 2023. .

### III. CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that Defendants' Motion to (1) Enforce Settlement Agreement and (2) Compel Execution of Release (Doc. 174) be **GRANTED**. The undersigned further **RECOMMENDS** that Plaintiffs Patrick and Jocelyn Bass be **ORDERED** to execute the Settlement Agreement forthwith.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen. LR 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to

object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the **19th** day of **August, 2024**.

s/P. BRADLEY MURRAY
UNITED STATES MAGISTRATE JUDGE